(90 Misc. Rep. 469)

LIFE PHOTO FILM CORPORATION v. BELL, Commissioner
of Licenses, et al.

(Supreme Court, Special Term, New York County.   May, 1915.)

1. INJUNCTION ⬉74—REVOCATION OF THEATER LICENSE—MOTION PICTURE.
    Where the commissioner of licenses threatens to revoke a theater li-
    cense if a certain motion picture film play is exhibited in the theater,
    basing his threat on the opinion of a board of censors, a self-constituted
    body, and the judgment of his deputy, and not on his own judgment, and
    where it appears that the play is morally unobjectionable, and that the
    proprietor of the theater will not produce the play and carry on its con-
    tract with the owner unless the threat is withdrawn, the owner of the
    film will be granted an injunction against the threatened action of the
    commissioner.

    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 142, 150;
    Dec. Dig. ⬉74.]

2. THEATERS AND SHOWS ⬉3—REVOCATION OF THEATER LICENSE—GROUNDS—
    MOTION PICTURE—"AMERICAN."
    That a motion picture play shows an officer of the German army in a
    cruel and inhuman light during the Franco-Prussian war will not justify
    the revocation of the license of a theater in which the film is shown,
    where there is nothing in the exhibition of· the play that can offend an
    American, assuming that the term "American" includes all classes of
    citizens, native and naturalized, irrespective of where they originally
    came from, especially where it further appears from the play that the
    officer was not a type, but·a variant.

    [Ed. Note.—For other cases, see Theaters and Shows, Cent. Dig. § 3;
    Dec. Dig. ⬉3.

    For other definitions, see Words and Phrases, First and Second Series,
    American.]

Action by the Life Photo Film Corporation to enjoin George H. Bell,
Commissioner of Licenses, etc., and others, from revoking a theater
license.   Judgment for plaintiff.

Rogers & Rogers, of New York City, for plaintiff.
Frank L. Polk, Corp. Counsel, of New York City, for defendants.

WHITAKER, J.   [1] Plaintiff is engaged in manufacturing, sell-
ing, and leasing for exhibition motion picture film plays and subjects.
In the regular course of its business plaintiff made and placed upon
the market at large expense for the purpose of having it exhibited
a film play known as "The Ordeal."   The play was based upon a
poem written long before the present European war.   The only means
the plaintiff has of deriving any remuneration for the making of the
picture is by renting or leasing it to different theaters for the pur-
pose of being exhibited.   Plaintiff entered into a contract with the
owners of Hammerstein's Lexington Avenue Opera House for the ex-
hibition of the picture, and after the picture had been shown once or
twice the defendant notified the proprietor that the film could not be
shown, and that if the film were exhibited the license of the theater

would be canceled and revoked. The proprietor of the theater will not produce the play and carry out its contract with plaintiff unless the threat is withdrawn, and threatens to cancel his contract with plaintiff. Defendant has also informed the plaintiff that he will not permit the film to be shown in any theater in New York City.

The case contains ample evidence to sustain the claims of the plaintiff that the production of the play is being prevented by the threats and conduct of the defendant. Defendant is the commissioner of licenses of the city of New York. There is no claim made by the defendant that the picture is immoral, indecent, or in any way unfit to be exhibited. The defendant testified in substance that the reason for objecting to the play was because the national board of censors and the deputy commissioner of licenses, Mr. Kaufmann, thought it would be inadvisable to exhibit the picture, because it might occasion racial differences at this particular time. Both Commissioner Bell and his deputy commissioner, Mr. Kaufmann, testified that there was nothing in the picture to which an American could take offense. The opposition and threats of the defendant are based, therefore, solely upon the ground that the board of censors and the deputy commissioner feared the disapproval of foreigners. The national board of censors is a self-constituted board. It is not organized or recognized by any provision of law, and it is a question how far a public officer charged with exercising official powers upon his own judgment should base his action upon the opinions of the board of censors and his deputy commissioner.

The play itself to a sensible and ordinary mind could in no way create racial strife. It simply portrays the dream of a young man. In the course of his dream he goes to war, presumably the Franco-Prussian war of 1870, leaving a sweetheart, mother, father, and sister at home. He is taken prisoner, and because he will not tell the hiding place of some of his fellow soldiers an officer wearing a German uniform condemns the sweetheart, mother, and sister to be shot. They are presumably shot, and the father is wounded in defending his home and dies. This is the dream, and at the end, when the young man awakes, the whole family has come to life again and appear in a happy group.

[2] The only possible objection that could be made is that possibly some supersensitive Teuton might consider it, as was testified by a young lady at the trial, an unfair characterization and a misrepresentation of the German army; but, as matter of fact, this is not so, for it appears that the person wearing the German uniform and presumably a German officer, who was guilty of the cruel and inhuman acts, was not a type, but a variant, and did not represent the German army, for immediately thereafter the German general appears and punishes the officer for his cruelty. An epitomized analysis of the play as exhibited shows that a boy some 45 years ago dreamed that once upon a time in France there was a bad and cruel officer in the German army and that he was punished by his superior officer for his cruelty. One would hardly consider this sufficient to arouse a moderately sensible audience to wrath and racial strife, be it of whatsoever nationality,

or sufficient as a basis for adverse official action upon the part of the commissioner of licenses.

But, assuming that the play did actually show an officer of the German army in a cruel and inhuman light during the Franco-Prussian war, this, in my opinion, would not form a proper basis for preventing the exhibition in view of the testimony of the defendant commissioner and his deputy that there was nothing in the exhibition of the play that could offend Americans. The court must assume that the term "American" includes all classes of citizens, native and naturalized, irrespective of where they originally came from, whether it be Germany or any other country. The court cannot give judicial sanction to the grouping of American citizens of different classes, and shape or color its decrees in accordance therewith; so that what has lately become known as "hyphenated" citizenship has no place or standing. It cannot properly be recognized by the court or any other branch of the government. The plaintiff should not, therefore, be interfered with in the transaction of its legitimate business because of the supersensitiveness of alien residents.

I have examined the able brief of the corporation counsel for the defendant and the argument contained therein, but do not feel that it should restrain this court from granting the relief sought by the plaintiff. Unless the defendant shall be restrained, it will be practically impossible for the plaintiff to exhibit its picture, and the plaintiff will lose a large proportion of the profit it had a right to expect when it made the film. I think the case of Syracuse Ice Cream Co. v. City of Cortland, 153 App. Div. 456, 138 N. Y. Supp. 338, is in point. Being of the opinion that the play itself is not offensive to any person of ordinary sense, and that it is a perfectly proper play in all respects to be put before the public, and it appearing that the judgment of the defendant in preventing its exhibition, according to defendant's brief, is based upon the judgment of an unofficial body and his deputy, Mr. Kaufmann, and not upon his own, and that by defendant's own testimony the play is unobjectionable, and that the reason assigned by defendant himself is insufficient to justify him in refusing to allow its exhibition, and that unless defendant is restrained there will be no way by which the plaintiff as matter of right will be able to test the question, I feel in justice to the plaintiff that the defendant should be restrained, and the relief prayed for in the complaint granted.

Judgment accordingly.